```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
ANDERSON ERALTE,                     :      14 Civ. 1745 (JCF)
                                     :
            Plaintiff,               :         MEMORANDUM
                                     :         AND  ORDER
     - against -                     :
                                     :
ACTING COMMISSIONER CAROLYN W.       :
COLVIN of Social Security,           :
                                     :
            Defendant.               :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

The plaintiff, Anderson Eralte, brings this action under section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a determination by the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits. The parties have consented to my exercising authority for all purposes pursuant to 28 U.S.C. § 636(c), and each party has submitted a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Because the Commissioner's decision is supported by substantial evidence, the plaintiff's motion is denied and the defendant's motion is granted.

Background

    A.   Personal and Vocational History

Mr. Eralte was born on February 18, 1982, in New York, New York. (R. at 31).[1] He has some college education and served in the U.S. Navy for eight years as a petty officer. (R. at 21, 32).

_____

[1] "R." refers to the certified administrative record filed with the Court as part of the Commissioner's answer.

He also has prior work experience as a customer service representative. (R. at 32).

While in the Navy, Mr. Eralte twice suffered a torn anterior cruciate ligament ("ACL") in his right knee, each injury requiring reconstructive surgery and physical therapy. (R. at 33-34). The initial ACL tear occurred during the plaintiff's first year in the Navy, and while the injury somewhat limited his physical activity, it did not render Mr. Eralte unfit for service. (R. at 33). The plaintiff remained in the Navy following his second ACL injury in 2010. (R. at 38-39). Mr. Eralte left the Navy in March 2011 and was not discharged for any medical reasons or as a result of any inability to perform his duties. (R. at 39).

Upon leaving the Navy, the plaintiff reported experiencing depression and post-traumatic stress disorder ("PTSD"), including symptoms of intrusive thoughts and memories, hyper-vigilance, aggressiveness, and poor sleep, which, he asserts, have impeded his ability to gain employment. (R. at 42-44). Mr. Eralte's last date of employment was March 8, 2011, when he was discharged from the service. (R. at 32-33, 112). He asserts that he is entitled to disability benefits due to PTSD, depression, the ACL tear with resulting arthritis, lower back pain, and plantar fasciitis. (R. at 33, 122).

     B.   <u>Medical History</u>

          1.   <u>Psychiatric Evaluations</u>

               i.   <u>Dr. Jeffrey S. Fine</u>

On July 19, 2011, the plaintiff presented to Dr. Jeffrey S.

Fine for a psychiatric evaluation. (R. at 187, 368). Mr. Eralte reported symptoms of poor sleep, depression, increased vigilance, anxiety, traumatic memories, decreased motivation, and loss of appetite. (R. at 188). Dr. Fine observed that the plaintiff was alert, his speech was coherent and goal-directed, and his affect was normal. (R. at 189). Mr. Eralte described a number of traumatic experiences relating to his childhood, his service in the Navy, and his father's death.[2] (R. at 188-89). Dr. Fine diagnosed depression, not otherwise specified, or, potentially, a prolonged grief reaction related to his father's death. (R. at 187, 189). Dr. Fine noted the possibility that the plaintiff suffered from PTSD as a result of traumatic experiences in the Navy and childhood sexual abuse. (R. at 187, 189-90). He prescribed Paxil and recommended that Mr. Eralte attend psychotherapy with a social worker. (R. at 190).

Mr. Eralte returned to Dr. Fine on August 10, 2011. (R. at 171). The plaintiff reported a decrease in intrusive memories and nightmares, but complained of stress, depression, internalized anger, and anxiety. (R. at 172). Dr. Fine conducted a mental status evaluation and concluded that the plaintiff was alert, cooperative, and generally normal, with the exception of a depressed mood. (R. at 172). Dr. Fine increased the dosage of the plaintiff's medication, and again suggested individual therapy.

---

[2]   Mr. Eralte described handling dead bodies and assisting survivors during a mudslide rescue in Malayasia. (R. at 188, 210). The plaintiff also recounted traumatic memories related to witnessing another sailor commit suicide and to being unable to communicate with his father. (R. at 189).

(R. at 172).

On October 14, 2011, the plaintiff again met with Dr. Fine, complaining of worsening depression, poor appetite, lack of concentration and motivation, anxiety attacks, and intrusive memories two or three times per week. (R. at 505). He had stopped taking Paxil six weeks prior, and was prescribed Wellbutrin. (R. at 504). Dr. Fine advised the plaintiff to return within one month or sooner. (R. at 504).

Mr. Eralte presented to Dr. Fine on November 10, 2011, describing his depression level as 4 out of 10, and stating that his intrusive memories and nightmares had decreased. (R. at 484). In light of Dr. Fine's conclusion that "some ptsd and depression" symptoms persisted, albeit "somewhat less," the plaintiff was prescribed a new antidepressant, Venalafaxine, and was advised to return again in one month. (R. at 484).

The plaintiff returned to Dr. Fine on December 28, 2011, reporting that the medications were helpful, describing his mood overall as "medium down." (R. at 459). Although the plaintiff reported fewer intrusive memories, his nightmares and symptoms of hyper-vigilance and anxiety persisted. (R. at 459).

On February 9, 2012, Mr. Eralte presented to Dr. Fine for medication management. (R. at 436). The plaintiff described his symptoms as being "reasonably stable," but reported that he continued to experience migraine headaches and intrusive memories several times per week. (R. at 436). In response, Dr. Fine increased the plaintiff's prescription. (R. at 436). On March 15,

4

2012, Mr. Eralte again met with Dr. Fine for medication management, continuing to complain of hyper-vigilance. (R. at 563). Mr. Eralte described his mood as "up and down" and "mildly depressed," but stated that he was "calm and in control" of his anger when he took his medication. (R. at 563).

One month later, the plaintiff continued to display symptoms of anxiety, lack of motivation and concentration, and intrusive traumatic memories, and rated his depression at a severity level of 8 out of 10. (R. at 537). A medical status examination was normal, but in light of the plaintiff's "high level of depression," Dr. Fine doubled the plaintiff's existing medication and prescribed Klonopin. (R. at 537).

Dr. Fine completed a psychiatric disability questionnaire on May 4, 2012, diagnosing Mr. Eralte with PTSD and depression, not otherwise specified. (R. at 525). He found Mr. Eralte markedly limited in his ability to understand and carry out detailed instructions, maintain concentration for extended periods, complete a normal workweek, and interact appropriately with the general public. (R. at 528-30). The plaintiff possessed moderate limitations in his ability to remember work-like procedures, and to work with peers and supervisors, but Dr. Fine assessed no limitations in the plaintiff's ability to understand, remember, and carry out simple instructions. (R. at 528-30). Dr. Fine assigned the plaintiff a Global Assessment of Function ("GAF") score of 50.[3]

_____

[3] The GAF rubric measures a clinician's overall judgment of a patient's level of psychological, social, and occupational functioning on a scale of 1 to 100. American Psychiatric

(R. at 525).

### ii.  Dr. Joshua Hooberman

The plaintiff visited Dr. Joshua Hooberman, a clinical psychologist, on July 28, 2011, reporting symptoms of depression, anxiety, and posttraumatic stress. (R. at 206, 212). Following an assessment of the plaintiff, Dr. Hooberman assigned a GAF score of 58, indicating moderate symptoms.[4] (R. at 211).  While the plaintiff exhibited some symptoms of PTSD, he did not meet the criteria for a diagnosis. (R. at 210-11). Dr. Hooberman found that Mr. Eralte's symptoms limited his occupational and educational functioning, noting that the plaintiff complained of significant difficulty concentrating on his school assignments.  (R. at 211). Dr. Hooberman diagnosed adjustment disorder with mixed depression and anxiety.  (R. at 211).

### iii. Dr. Fairweather

On October 31, 2011, another clinical psychologist, Dr. Angela Fairweather, met with Mr. Eralte, and conducted a mental status examination.  (R. at 391).  Dr. Fairweather noted a depressed affect and dysthymic mood,[5] but found that the plaintiff was able

---

Association, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. rev. 2000) ("DSM-IV").  A GAF in the 41 to 50 range indicates serious symptoms or some serious impairment in social, occupational, or school functioning.  DSM-IV at 34.

[4] A GAF score in the 51-60 range indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

[5] Dysthymia is chronic depression with symptoms that are longer-lasting but less severe than major depression.  Dysthymia, Medline Plus, a Service of the U.S. National Library of Medicine, National Institute of Health, available at

to follow and understand simple instructions, perform simple tasks independently, learn new tasks, and make appropriate decisions. (R. at 392-93).   The plaintiff exhibited mild difficulty maintaining concentration and performing complex tasks independently, as well as moderate difficulty maintaining a regular schedule and dealing appropriately with stress. (R. at 393).  Dr. Fairweather diagnosed the plaintiff with major depressive disorder, without psychotic features, and anxiety disorder not otherwise specified, noting that his symptoms may cause "moderate impairments" with respect to his daily functioning. (R. at 393-94).

### iv.   Linda Blackwell, State Agency Psychologist

On November 10, 2011, Linda Blackwell, a State agency psychologist, performed a Psychiatric Review and found that Mr. Eralte possessed mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, but had no restrictions on daily living activities. (R. at 395, 405).   A functional capacity assessment indicated that the plaintiff possessed mild to moderate limitation in work-related functioning, but retained the ability to perform substantial gainful activity. (R. at 411).

### v.   Sharon Morrison, LCSW

On October 14, 2011, the plaintiff met with Sharon Morrison, a licensed clinical social worker, reporting symptoms of

---

http://www.nlm.nih.gov/medlineplus/ency/article/000918.htm (last visited Dec. 4, 2014).

depression, low self-esteem, and decreased appetite.  (R. at 503).
He returned on October 27, and reported that while he was coping,
he had "hard days" where he found it difficult to leave his home if
he did not have scheduled appointments.  (R. at 496).  When he next
visited on November 14, Mr. Eralte stated that he was "doing okay,"
and was able to cope with school- and housing-related stress.  (R.
at 483).  The plaintiff returned to Ms. Morrison again on March 15,
2012, and reported being in "good spirits" after returning from a
recent trip to the Cayman Islands and Jamaica. (R. at 562). He also
indicated that the medication continued to help him "cope with his
emotions of anger and sadness," and that he had recently completed
a semester of college, earning B's in each of his four classes.
(R. at 562).  When Mr. Eralte returned to Ms. Morrison a month
later, he complained of being "really stressed out" regarding his
financial situation, but appeared otherwise stable.  (R. at 541).

2.   Traumatic Brain Injury Evaluations

Progress notes from the Veterans' Affairs Medical Center dated
September 30, 2011, through March 7, 2012, document Mr. Eralte's
history of migraines, and note that the plaintiff experienced
symptoms of low concentration and low attention, distractibility,
and poor memory, all associated with prior traumatic brain injury.
(R. at 431-33).

After an evaluation on October 11, 2011, Dr. Emile Hiesiger
diagnosed post traumatic headaches and post traumatic right
temporal pain.  (R. at 279-81).  The plaintiff underwent a second
evaluation on October 27, 2011, in which he described being hit

8

over the head with a bottle in 2006 and his current symptoms of poor coordination and concentration, headaches, memory loss, sensitivity to noise and light, slowed thinking, and difficulty getting organized. (R. at 497). Dr. Qian Gary Fang recommended the plaintiff attend occupational therapy workshops to address any cognitive effects related to his symptoms, and referred him to a neurologist for further evaluation of his migraines. (R. at 498-99).

On December 9, 2011, the plaintiff visited his primary care physician, Dr. Heidi Golden, complaining of intermittent headaches and sensitivity to light resulting from his head injury. (R. at 471). Dr. Golden ordered a magnetic resonance imaging ("MRI") of Mr. Eralte's brain and referred him to an optometrist and a neurologist. (R. at 472-74).

On December 21, 2011, Mr. Eralte met with Vivian Shapiro, an occupational therapist, who conducted a series of cognitive tests related to his brain injury. (R. at 461). A Neurobehavioral Cognitive Status Examination showed mild memory deficits but indicated that the plaintiff was otherwise normal, scoring on par or passing tests in all other areas related to cognitive functioning.[6] (R. at 465). An MRI of the plaintiff's brain, performed on January 5, 2012, showed no acute or traumatic intercranial abnormalities. (R. at 419-20).

_____

[6] In addition to memory, the plaintiff was evaluated on his level of consciousness, orientation, attention, language, comprehension, repetition, naming, constructional ability, calculations, reasoning, and judgment. (R. at 463-64).

On February 2, 2012, the plaintiff presented for a neurological consultation with Dr. Shavonne Massey, a neurology resident at the Veteran's Administration (the "VA"). (R. at 441). Dr. Massey diagnosed post-concussive migraine syndrome and prescribed magnesium oxide, riboflavin, fioricet, and ibuprofen. (R. at 442). She further suggested that Mr. Eralte consult with his psychiatrist to discuss increasing his dosage of Effexor, an antidepressant, which also functioned as a migraine prophylactic. (R. at 442). After a March 9, 2012, follow-up, Dr. Golden indicated that the increased dose of Effexor had improved the plaintiff's migraine symptoms. (R. at 566).

By March 20, 2012, the plaintiff had met all of his occupational therapy goals and was discharged from his treatment program. (R. at 558). Mr. Eralte returned to Dr. Golden on April 24, 2012, with forms for his disability application. (R. at 548). X-rays of his skull performed on that same date showed no significant findings. (R. at 534). Two days later, on April 26, the plaintiff followed up with Dr. Massey, who also found no acute or traumatic intracranial abnormalities and noted an improvement in Mr. Eralte's post-concussive migraine symptoms. (R. at 539-40).

### 3. Physical Evaluations

Mr. Eralte also has a history of right knee trauma. (R. at 301-02). In 2004, a graft was conducted on his right ACL, and in 2010, a second arthroscopic surgery was performed to reconstruct the same ligament. (R. at 302). Mr. Eralte estimates that he is presently able to stand for an hour before experiencing pain in his

knee.  (R. at 34-35).  The plaintiff also has a history of lumbo-sacral strain.  (R. at 282).  Mr. Eralte has exhibited decreased range of motion and pain with forward flexion, tenderness or pain on palpitation in joints and soft tissue of the thoracolumbar spine, muscle spasms, pain on movement, instability of station, and straightening of the lumbar lordosis -- an abnormal spinal contour. (R. at 282-86).

On May 13, 2011, Mr. Eralte presented to Dr. Margaret Horlick of the VA for a regular physical examination, complaining of constant pain in his right knee, at a level of 4 out of 10, and lower back, at a level of 3 out of 10.  (R. at 270).  Dr. Horlick reported no abnormalities.  (R. at 267-69).  Another physical examination was conducted at the VA on July 21, 2011, and Mr. Eralte was found to be in normal condition. (R. at 177-83).  The plaintiff returned to the VA on August 19, 2011 where a physical examination conducted by his primary care physician found that he was in good health.  (R. at 158-59).

On September 23, 2011, x-rays of the plaintiff's lumbosacral spine revealed mild anterior wedging of the T12 veterbral body but were otherwise normal, while x-rays of his right knee showed post-surgical and mild degenerative changes.  (R. at 149-52).  On September 30, 2011, the plaintiff had a physical therapy consultation with Dr. Philip Poulos at the VA.  (R. at 332-35). Dr. Poulos noted that Mr. Eralte was experiencing no new knee pain in his right knee but that he reported discomfort while running or walking for prolonged distances.  (R. at 335).  The plaintiff

11

exhibited a normal gait, full strength, no deficit in straight leg raising, and no gross abnormality, swelling, or joint line tenderness in his right knee. (R. at 334). Dr. Poulos recommended physical therapy twice a week for one month, as well as moist heat and stretching. (R. at 334).   On October 11, 2011, Dr. R. Kuchment of the VA examined the plaintiff and completed a questionnaire in connection with Mr. Eralte's claim for disability benefits. (R. at 281-313). Dr. Kuchment diagnosed lumbosacral strain to the plaintiff's back, but noted nearly full forward extension, with some discomfort, as well as normal lateral flexion and rotation. (R. at 282-85). Dr. Kuchment also diagnosed posttraumatic osteoarthritis and lateral meniscal tear of the plaintiff's right knee. (R. at 301-02). Knee flexion and extension were both normal, and the plaintiff exhibited full joint stability and bilateral strength in his right knee. (R. at 307-08).

On October 13, 2011, a physical therapy examination revealed a full range of motion of the plaintiff's trunk and both knees, and Mr. Eralte again exhibited nearly full strength and flexion of his knees. (R. at 510-11). The plaintiff was able to tolerate physical therapy sessions on October 20 and 27, and November 7, and described pain levels of 1-5 out of 10 in his right knee, and back pain at 8 out of 10, at each session. (R. at 488-89, 494, 500).

On October 31, 2011, Dr. Louis Tranese performed an orthopedic examination of the claimant, noting that Mr. Eralte had a history of planter fasciitis, but he found no abnormalities in the right

knee.  (R. at 386-88).  Aside from mild-to-moderate restrictions
with frequent squatting, stair climbing, standing for long
durations, and walking for long distances, the plaintiff's physical
examination was otherwise normal.  (R. at 388).  On November 2,
2011, x-rays of the plaintiff's lumbosacral spine found no
abnormalities.  (R. at 389).  X-rays of his right knee were
unremarkable aside from showing evidence of ACL reconstruction
surgery.  (R. at 390).

Mr. Eralte visited Dr. Marguerite Diab at the VA on April 25,
2012, complaining of chronic knee pain that had worsened over the
prior two months.  (R. at 542-44).  Range of motion and strength,
however, were nearly full, and  it was noted that the plaintiff was
able to exercise using an elliptical machine and engage in leg
press and curl exercises.  (R. at 542).  Observing that the
plaintiff had a slightly antalgic gait and showed some effusion and
joint line tenderness, as well as crepitus, in his right knee, Dr.
Diab prescribed an additional course of physical therapy.  (R. at
542-43).

C.  Procedural History

The plaintiff filed an application for disability benefits on
August 16, 2011, due to a torn ACL, knee arthritis, lower back
pain, plantar fasciitis, depression, and PTSD, alleging an onset
date of March 8, 2011.  (R. at 112, 122).  After his application
was denied on November 30, 2011, Mr. Eralte requested review by an
Administrative Law Judge ("ALJ"), and a hearing before ALJ Mark
Hecht was held on July 17, 2012.  (R. at 28-45, 49, 61-62).

The plaintiff was represented by counsel at the hearing. (R. at 26-27). He testified that prolonged standing caused "incredible pain" in his right knee as a result of his ACL injuries, but that he could stand for roughly an hour before the onset of discomfort. (R. at 34). Mr. Eralte stated that he saw a psychiatrist once while enlisted, following the death of his father, but that his depression began after he left the Navy. (R. at 35-36). He described his monthly psychiatric treatment at the VA, and testified that the prescribed medication helped his depression-related symptoms. (R. at 36). Mr. Eralte testified that his PTSD, which did not begin until he left the service, was manifested by "intrusive thoughts of numerous things" that occurred while in the Navy. (R. at 36-37). He further stated that his posttraumatic stress and depression prevented him from performing household chores and taking care of his daily needs, and that his daily activities consisted of managing his bills, taking care of his son, and exercising to relieve stress. (R. at 37-38). He described losing interest in all of his hobbies, feeling detached, being unable to sleep at times, and suffering from intrusive thoughts, all of which, he indicated, were symptoms he did not experience while in the Navy. (R. at 38).

At the hearing, Mr. Eralte acknowledged that he had a number of specialties while in the service. (R. at 38-39). He stated that he was not discharged for any medical reasons and was not criticized for his work in the service, explaining that his posttraumatic stress and depression were "realized after the fact

and after being in a blanket." (R. at 39-40). Upon examination by
his attorney, Mr. Eralte noted that the PTSD symptoms affected him
on a daily basis, stating, "If I go anywhere with a crowded area my
mindset is basically being closer to a wall." (R. at 42). He
indicated that after being discharged, he attempted to work as a
security officer, but that the job "didn't last an hour" because it
was in a "very bad location in the Bronx" and offered inadequate
pay. (R. at 42). He acknowledged his treatment with Dr. Fine and
with a social worker at the VA, and stated that he sought to
achieve "hopeful normalness." (R. at 43). When asked by his
attorney if he felt he could perform full-time, "five days a week,
eight hours a day" work, he responded negatively. (R. at 44).

Following the hearing, ALJ Hecht determined that the plaintiff
was not disabled within the meaning of the Social Security Act
during the period beginning March 8, 2011, through July 26, 2012,
the date of the decision (R. at  15-22). The Appeals Council
denied Mr. Eralte's request for review on January 7, 2014. (R. at
1-5). The present action followed.

Discussion

    A.   Standard of Review

Section 205(g) of Title 42 of the Social Security Act allows
a claimant to obtain judicial review of the Commissioner's final
determination denying an application for disability insurance
benefits. 42 U.S.C. § 405(g). In conducting its review, the court
may "set aside a decision of the Commissioner if it is based on
legal error or if it is not supported by substantial evidence" in

the record.  Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at
*2 (S.D.N.Y. Aug. 22, 2008) (citing Balsamo v. Chater, 142 F.3d 75,
79 (2d Cir. 1998)).   Accordingly, judicial review requires two
levels of inquiry.   First, the court must determine whether the
Commissioner applied the correct legal standard.  Tejada v. Apfel,
167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ.
4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).   Second,
the court must decide whether the ALJ's decision was supported by
substantial evidence.   Tejada, 167 F.3d at 773; Calvello, 2008 WL
4452359, at *8.

     Substantial evidence in this context must be "'more than a
mere scintilla.  It means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion.'"  Hahn v.
Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 17,
2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971));
accord Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004).  To
determine whether substantial evidence exists, the court must
consider "the whole record, examining the evidence from both sides,
because an analysis of the substantiality of the evidence must also
include that which detracts from its weight." Longbardi v. Astrue,
No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009);
see also Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).   If the
court finds that the Commissioner's decision is supported by
substantial evidence, it must be upheld, "even if substantial
evidence also supports the contrary result."  Ventura v. Barnhart,
No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006);

see also Alston v. Sullivan, 904 F. 2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")

A claimant will be considered disabled under the Act and therefore entitled to disability benefits if the record demonstrates that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Hahn, 2009 WL 1490775, at *6; Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000). The claimant's physical or mental impairment(s) must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has established a five-step analysis that the Commissioner follows in evaluating whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520. First, the claimant must establish that he is not currently engaged in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i),(b). If the claimant is not so engaged, the Commissioner then determines whether the claimant has an impairment severe enough to significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). If the claimant

demonstrates an impairment that meets or equals one of the disabilities listed in Appendix 1 of the regulations, the claimant is automatically found to be disabled and eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If the claimant's impairment is not among those listed, the claimant must prove that he does not have the residual functional capacity to return to his former employment. 20 C.F.R. § 404.1520(a)(4)(iv), (f). If the claimant establishes that he is incapable of returning to his prior work, the burden of proof shifts to the Commissioner to show that there is indeed other work available in the national economy that the claimant would be able to perform. 20 C.F.R. § 404.1520(a)(4)(v), (g), (h); see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

At each stage of the analysis, the ALJ "must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests, and must address all pertinent evidence." Delacruz v. Astrue, No. 10 Civ. 05749, 2011 WL 6425109, at *8 (S.D.N.Y. Dec. 1, 2011); see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984); Pacheco v. Barnhart, No. 03 CV 3235, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (finding ALJ's determination not set forth with "sufficient specificity" where she failed to adequately explain which evidence was considered at each step).

B.   Application

1.   The ALJ's Decision

The ALJ applied the correct legal standard to Mr. Eralte's claims, relying on the five-step sequential analysis to determine

18

that the plaintiff was not disabled under the Act during the relevant period. (R. at 15-22). At the initial step, he found that the plaintiff had not engaged in substantial gainful activity since March 8, 2011. (R. at 17). At step two, the ALJ determined that Mr. Eralte had four impairments that qualified as severe -- a history of torn ACL, low back pain, depression, and PTSD. (R. at 17). However, at the third step, the ALJ did not find any individual impairment, nor any combination of those impairments, as satisfying or medically equivalent in severity to one of the listed impairments under the regulations. (R. at 17-18).

At step four, the ALJ determined that Mr. Erlate retained the residual functional capacity to perform sedentary work, but could only do simple tasks as a result of his mental impairment. (R. at 18). In making this determination, the ALJ found that each of the plaintiff's listed impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found Mr. Eralte's statements regarding "the intensity, persistence, and limiting effects of these symptoms [not to be] credible to the extent they are inconsistent" with the ALJ's assessment of Mr. Eralte's residual functional capacity. (R. at 19-21). He considered Mr. Eralte's history of right knee dysfunction, prior surgeries, and lower back pain; he also considered Mr. Eralte's testimony that he was able to exercise frequently, and the medical evidence documenting full strength in his legs, full range of motion in the spine, and the generally normal medical imaging of both the lumbar spine and the right knee. (R. at 18-20). The ALJ concluded that

Mr. Eralte possessed the ability to perform at least sedentary work. (R. at 21).

In addressing the plaintiff's mental impairments, the ALJ found that, while significant, these limitations related predominantly to adjustment to civilian life and financial problems, but did not preclude Mr. Eralte from performing simple tasks. (R. at 21). ALJ Hecht noted inconsistencies between the medical opinions concerning the limiting effects of the plaintiff's mental impairments and "the bulk" of the treatment records. (R. at 21). In addition to the treating source medical records and Mr. Eralte's conservative treatment history, the ALJ relied on the opinion of Dr. Fine, giving great weight to his finding that the plaintiff was able to follow and understand simple instructions. (R. at 21). The ALJ also noted Mr. Eralte's testimony about his ability to care for his young child and his having succeeded academically upon returning to college. (R. at 21).

ALJ Hecht found that Mr. Eralte was unable to perform past relevant work as a naval petty officer. (R. at 21). However, taking into consideration the plaintiff's age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines (the "Grids"), the ALJ determined at step five that Mr. Eralte was not disabled under the Act. (R. at 22).

2.   <u>Substantial Evidence</u>

a.   <u>Severe Impairments - Traumatic Brain Injury</u>

Mr. Eralte claims that remand is warranted because the ALJ failed to consider the effects of his traumatic brain injury and post-concussive migraine syndrome at step two of the sequential evaluation process.   (Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Pl. Memo.") at 20-22; Plaintiff's Reply Memorandum of Law in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings ("Pl. Reply") at 1-4). The Court notes that despite having counsel, the plaintiff failed to allege impairments resulting from his traumatic brain injury in his initial application for benefits (R. at 122), his hearing testimony (R. at 31-45), and his submission to the Appeals Council (R. at 139-45).   <u>See</u> <u>Partee v. Astrue</u>, 638 F.3d 860, 864 (8th Cir. 2011) (noting ALJ may consider claimant's failure to list impairment in application for benefits).

An impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. § 404.1520(c).   Basic work activities are those "abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 404.1521(b).   The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work.   <u>Reices-Colon v. Astrue</u>,

21

523 F. App'x 796, 798 (2d Cir. 2013) ("Because [the excluded conditions] were considered during the subsequent steps, any error was harmless."); see also Zabala v. Astrue, 595 F.3d 402, 409-10 (2d Cir. 2010)(where medical report presented no reasonable likelihood of changing ALJ's disability determination, exclusion of report does not require remand).  When the parties disagree over the effect of the ALJ's failure to include a condition at step two, resolution of "this issue comes down to a question of whether there was substantial evidence to support the ALJ's conclusion that [the omitted condition] should not be included as a 'severe impairment.'"  Hussain v. Commissioner of Social Security, No. 13 Civ. 3691, 2014 WL 4230585, at *7 (S.D.N.Y. Aug. 27, 2014)(citing 42 U.S.C. § 405(g)).  Here, there is substantial evidence in the record to support the finding that Mr. Eralte's post-concussive migraine syndrome and related effects had not only improved with treatment, but had no more than a minimal impact on his ability to work and therefore remand is not warranted.  See, e.g., Marlise v. Astrue, 641 F.3d 919, 923-24 (8th Cir. 2011) (responsiveness to medication and improvement of migraines supported ALJ's finding that they were not severe impairment).

Mr. Eralte's treatment records indicate a diagnosis of post-concussive migraine syndrome, with a history of related symptoms including low concentration and attention, sensitivity to bright light and noise, poor memory, right temporal pain, and headaches. (R. at 279-81, 332, 431-33, 441-42, 497).  The ALJ's decision, while silent on the plaintiff's post-concussive migraines at step

two, indicates consideration of the impact of these symptoms upon Mr. Eralte's overall capability to perform basic work-related activities.  See Balodis v. Leavitt, 704 F. Supp. 2d 255, 262-63 (E.D.N.Y. 2010) (impairment or combination of impairments not "severe" if "medical and other evidence establishes only a slight abnormality . . . that would have no more than a minimal effect on an individual's ability to work."). Basic work activities include understanding, carrying out, and remembering simple instructions, responding appropriately to supervision and co-workers, and use of judgment.  20 C.F.R. § 404.1521(a), (b). Specifically, ALJ Hecht discussed a mental status examination conducted by Dr. Hooberman, which found that Mr. Eralte possessed logical and well-organized thought, and a similar examination performed by Dr. Fairweather, which found that Mr. Eralte possessed only "mild difficulty maintaining attention and concentration," that his judgment was good, and that his "thought processes were coherent and his attention, concentration, and memory were intact." (R. at 19-20; see also 206-11, 391-94). The ALJ also factored in notes from Mr. Eralte's treating psychiatrist, Dr. Fine, which indicate "no evidence of limitation in [Mr. Eralte's] ability to understand and remember one or two step instructions" and moderate limitations in the plaintiff's ability to interact appropriately with co-workers and to make simple work decisions. (R. at 19, 529-530). This, the ALJ indicated, was directly factored into his residual functional capacity finding that the plaintiff retained the ability to perform "simple" tasks. (R. at 21).

23

Dr. Golden, the plaintiff's primary care physician, found no initial abnormalities in relation to Mr. Eralte's complaints of intermittent headaches.  (R. at 472-74).  Shortly thereafter, the plaintiff presented for a Neurobehavioral Cognitive Status ("COGNISTAT") Examination, complaining of headaches at a pain and intensity level of 2 out of 10.  (R. at 462).  With the exception of a "mild deficit in memory," however, Mr. Eralte scored in the average range of each major category of cognitive ability that was tested, including orientation, attention, comprehension, calculations, reasoning, and judgment.  (R. at 464-65).  Both an MRI of the plaintiff's brain and an x-ray of his skull showed no acute or traumatic findings.  (R. at 419-20, 534).  Treatment notes indicate that, although not completely resolved, the plaintiff's headaches and photosensitivity had improved with medication.  (R. at 539-40, 568).  Mr. Eralte also completed a occupational therapy program in relation to his cognitive functioning abilities, meeting both short-term and long-term treatment goals before being discharged.[7]  (R. at 558).  The ALJ's decision considered pertinent medical and opinion evidence, as well as Mr. Eralte's own testimony regarding his abilities, which noted that he had recently completed a semester of college, earning a B in each of his four classes.  (R. at 21, 562).  In sum, the ALJ adequately considered the symptoms and cognitive effects of Mr. Eralte's post-concussive

---

[7] These goals included college organizational skills, such as time management, study habits, and goal-setting.  (R. at 455).

migraine syndrome throughout the sequential process and in relation to the plaintiff's ability to perform basic work functions.

b.   Evaluation of Opinion Evidence

Mr. Eralte asserts that in concluding that he was no more than moderately limited in his ability to sustain concentration, persistence or pace, the ALJ failed to consider the opinion of Dr. Fine, the treating psychiatrist, with "additional care."   (Pl. Memo. at 18-19).   Moreover, he argues that, even if Dr. Fine's opinion is not entitled to controlling weight, the ALJ failed to explain why significant weight was afforded the opinions of Dr. Fairweather, a consultative examiner.   (Pl. Memo. at 18-20 (citing 20 C.F.R. § 404.1527)).   A reading of the ALJ's decision as a whole, however, makes clear that the opinions of Dr. Fine, while considered "in part" (R. at 21), were not afforded controlling weight because of their inconsistences with other substantial evidence in the record.   20 C.F.R. § 404.1527(c)(2), (4); see also Mongeur v. Heckler, 722 F. 2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence."); Torres v. Colvin, No. 12 Civ. 6527, 2014 WL 4467805, at *7 (S.D.N.Y. Sept. 8, 2014)(treating source opinion is only afforded controlling weight when consistent with substantial evidence).

Dr. Fine found that the plaintiff suffered marked limitations in understanding detailed instructions, as well as in maintaining attention and concentration. (R. at 19, 528-29). However, the ALJ assigned  less  weight  to  these  observations  as  they  were

inconsistent with "the bulk of the treatment records," including the findings of at least two other clinical psychologists, and a State agency psychologist, as well as with Mr. Eralte's testimony regarding his activities and abilities. (R. at 18-21); Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) (declining to give treating physician additional weight when opinion conflicted with two consultative psychologists, including State Agency examiner); see also Halloran, 362 F.3d at 32 (declining to give controlling weight to treating physician when opinion conflicted with several other medical experts); Social Security Ruling ("SSR") 96-7p (holding that activities of daily living are pertinent factor in assessing credibility of plaintiff's symptoms).

A psychiatric evaluation conducted by Dr. Fairweather explicitly found that the plaintiff possessed the ability to follow and understand simple instructions and to learn and perform simple new tasks independently. (R. at 393). Moreover, Dr. Fairweather noted that Mr. Eralte exhibited only mild difficulty maintaining attention and concentration, performing complex tasks independently, and relating adequately to others. (R. at 20, 393). More weight was assigned to Dr. Fairweather's evaluation as it was consistent with other evidence throughout the record. Diaz v. Shalala, 59 F. 3d 307, 313 n. 5 (2d Cir. 1995) (regulations accord less deference to treating physicians whose opinions are not supported by other evidence); Blaylock-Taylor v. Barnhart, No. 03 Civ. 3437, 2005 WL 1337928, at *10 (S.D.N.Y. June 6, 2005)

(opinions of consultative sources constitute substantial evidence when consistent with other medical evidence in record).

For example, Dr. Fairweather's opinion was consistent with the mental status examination performed by Dr. Hooberman, which found the plaintiff to be alert and attentive, while possessing a well-organized, logical, and goal-directed thought process. (R. at 19, 210-11). Ms. Blackwell, a State agency psychologist, also found that the plaintiff was no more than moderately limited in his ability to sustain concentration, persistence, or pace, and only mildly limited in maintaining social functioning. (R. at 405). While Dr. Fine determined that the plaintiff suffered marked limitations in his ability to understand, remember, and carry out detailed instructions, maintain concentration, and interact appropriately with the general public (R. at 528-30), Ms. Blackwell found no significant limitations in his ability to remember work-like procedures, understand detailed instructions, maintain concentration for extended periods, or work in coordination or proximity to others without being distracted by them. (R. at 409); 20 C.F.R. § 404.1527(e) (ALJ may consider findings of State agency psychological consultant as opinion evidence); SSR 96-6p (findings made by State Agency consultants must be treated as expert opinion evidence).

Finally, the ALJ considered the objective medical opinions in tandem with Mr. Eralte's own testimony regarding his daily activities, specifically his ability to sustain the concentration to receive B's in all his college classes and to care for his young

child several times a week.  (R. at 21, 38 208, 386, 562).  The ALJ's failure to "[mention] every item of testimony presented to him or [explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability" does not warrant remand when, as here, a reading of the opinion in light of the record as a whole enables the court to ascertain the Commissioner's rationale.  Mongeur, 722 F. 2d at 1040; see also Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand.") In sum, there is substantial evidence to support the ALJ's determination that Mr. Eralte was no more than moderately limited in his ability to sustain concentration, persistence or pace, notwithstanding Dr. Fine's opinion.

c.   Residual Functional Capacity

The ALJ determined that Mr. Eralte had the residual functional capacity to perform "sedentary work . . . except that he can only perform simple tasks due to his mental impairment." (R. at 18). When determining a claimant's residual functional capacity, the ALJ must consider all relevant and other evidence regarding the claimant's physical and mental abilities, pain, and other limitations, in order to determine whether the plaintiff retains the ability to return to past relevant work, or in the alternative, to adjust to other work existing in the national economy.  20 C.F.R. 404.1545(a).  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles

28

like docket files, ledgers, and small tools, while "periods of standing or walking should generally total no more than about 2 hours of an 8-hour work day, and sitting should generally total approximately 6 hours of an 8-hour workday."   Penfield v. Colvin, 563 F. App'x 839, 849 n. 1 (2d Cir. 2014) (citing 20 C.F.R. § 404.1567(a)).

In this case, substantial evidence supports the ALJ's determination that the plaintiff retained the residual functional capacity to perform sedentary work, and that his mental impairments were sufficiently controlled for him to perform simple tasks. Medical records and testimony show that despite mild-to-moderate restrictions with frequent squatting, stair climbing, standing for long durations, and walking for long distances, Mr. Eralte exhibited a normal gait and full strength in his right knee, was able to stand for an hour at a time, and frequently exercised. (R. at 21, 34-35, 334, 388, 542).

Nevertheless, Mr. Eralte asserts that the ALJ should have found moderate, as opposed to mild, difficulties with respect to social functioning, and as a result, failed to include adequate restrictions with "regard to [his] ability to interact appropriately with the general public and supervisors." (Pl. Reply at 4). Further, the plaintiff contends that substantial evidence demonstrates that he possessed moderate limitations in keeping a schedule, and that the limitation to "simple work" does not adequately incorporate these difficulties. (Pl. Reply at 7).

29

The ALJ's residual functional capacity determination demonstrates a consideration of all relevant evidence regarding the plaintiff's mental and social functioning limitations, and correctly found that "the bulk of treatment records" and "the claimant's testimony" supported the finding that he retained the capability to perform simple tasks. (R. at 21); Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013) (residual functional capacity determination evaluates "all of the [applicant's] symptoms and the extent to which the claimed symptoms can reasonably be accepted as consistent" with the record." (citing 20 C.F.R. § 416.929)); Genier v. Astrue, 606 F. 3d 46, 49 (2d Cir. 2010) (when determining capacity, ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."); Mojica v. Commissioner of Social Security, No. 13 Civ. 5631, 2014 WL 6480684, at *13 (S.D.N.Y. Nov. 17, 2014) (finding that in determining capacity, ALJ properly evaluated credibility of plaintiff's symptoms in context of entire record).

Dr. Fine found moderate limitations in the plaintiff's ability to get along with co-workers, accept instructions, and respond appropriately to criticism from supervisors, and marked limitations in the plaintiff's ability to interact with the general public. (R. at 530). He also determined that Mr. Eralte was markedly limited in his ability to keep a schedule and maintain regular attendance. (R. at 529). However, the ALJ considered these

symptoms to the extent that they could reasonably be found to be consistent with the objective medical and other evidence. (R. at 18-21); 20 C.F.R. § 404.1529. As described above, a reading of the ALJ's decision as a whole in light of the record indicates why the ALJ afforded more weight to the treatment notes of Dr. Fairweather and Ms. Blackwell, as well as the plaintiff's own testimony, in assessing the credibility of Mr. Eralte's symptoms and the extent to which they limited his residual functional capacity. (R. at 18-21).

Dr. Fairweather assessed moderate limitations in the plaintiff's ability to maintain a schedule, while Ms. Blackwell found no significant limitations in Mr. Eralte's ability to keep to a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. at 393, 409). Upon examination, Dr. Fairweather, Ms. Blackwell, and Dr. Hooberman each found the plaintiff to be cooperative, his behavior appropriate, and his social skills adequate. (R. at 19-20, 210, 392, 410). As noted, Dr. Fairweather found only mild difficulties in the plaintiff's ability to relate adequately to others, and indicated that he "spends his days watching TV and socializing." (R. at 393). Ms. Blackwell also assessed insignificant limitations in the plaintiff's ability to get along with co-workers and maintain socially appropriate behavior, and moderate difficulty in his ability to interact appropriately with the general public. (R. at 410). The record also indicates that the plaintiff was able to follow a schedule in attending weekly physical and occupational

therapy appointments, completing both programs.  (R. at 444, 488-90, 494, 500, 510-11, 558).  Again, the ALJ also considered Mr. Eralte's testimony that he was able to perform at college and frequently care for his son.  (R. at 21, 38, 208, 386, 562).  In sum, the ALJ considered the full scope of the plaintiff's treatment records and testimony regarding his daily activities and abilities in reaching his residual functional capacity determination.  (R. at 18-21).

> d.   <u>Vocational Expert</u>

Finally, the plaintiff argues that the ALJ erred in relying on the Grids without obtaining testimony from a vocational expert.  (Pl. Memo at 14-15).  He maintains that a vocational expert was required because significant non-exertional impairments exist that further limit his ability to perform the basic demands of unskilled work existing in the national economy.  (Pl. Memo. at 15-16).  At step five, the Commissioner is required to consult a vocational expert when the claimant possesses non-exertional limitations that "'significantly limit the range of work permitted by his exertional limitations.'"  <u>Zabala</u>, 595 F.3d at 410 (quoting <u>Bapp</u>, 802 F. 2d at 605).  Thus, the "mere existence" of a non-exertional impairment will not automatically require the testimony of a vocational expert; instead, the non-exertional limitation must cause an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  <u>Bapp</u>, 802 F. 2d at 605-06.

Here, the ALJ found that Mr. Eralte's non-exertional limitation to simple tasks did not significantly narrow the number of sedentary occupations available in the national economy. (R. at 21-22). Moreover, substantial evidence demonstrates that the plaintiff's non-exertional limitations have no more than a minimal effect on his ability to perform the basic demands of competitive, remunerative, unskilled work,[8] and therefore the ALJ was justified in relying on the Grids without consulting testimony from a vocational expert. (R. at 22).

Conclusion

For the reasons set forth above, the plaintiff's motion for judgment on the pleadings is denied and the defendant's motion is granted. The Clerk of Court is respectfully requested to enter judgment dismissing the complaint and to close this action.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       December 23, 2014

---

[8] These demands include the ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting. SSR 85-15.

33

Copies mailed this date:

Nicole J. Kim, Esq.
Schwartzapfel Lawyers, P.C.
300 Jericho Quadrangle, Suite 180
Jericho, New York 11753

Emily M. Fishman, Esq.
Social Security Administration
26 Federal Plaza Room 3904
New York, New York 10278